The Honorable Court is now in session. Our next case is CLS BANK v. ALICE. The Supreme Court has told us that to transform an unpatentable principle into a patent-eligible application, quote, one must do more than simply state the principle while adding the The question in this case, the core question in this case we submit, is whether one may transform an unpatentable principle into a patent-eligible application by simply stating the principle, an abstract idea, while adding the words, compute it. The answer to that question is no. And we know that from the Benson case. The Supreme Court has already told us in precisely these circumstances that reciting an abstract idea on a computer is not sufficient. As the Mayo case summarized Benson in a quote that is equally dispositive of this case. Mr. Perry, that's easy. But how do you know what's an abstract idea? Your Honor, there may be many kinds of abstract ideas. In this case, we would submit that it is easy. A method that can be performed entirely in the human mind or with the aid merely of a pencil and paper is an abstract idea. This court said that in the CyberSource case. The Supreme Court said that in the Benson case. The Supreme Court reiterated that in the Fluke case. The PTO agrees with that standard. The manual in section 2106 says that abstract and purely mental mean the same thing. And the PTO in this very case made that determination as to these claims. When the 510 patent was being prosecuted, Your Honor, the claims were rejected by the PTO under section 101 as abstract ideas. This appears on page A874 of the appendix. And what the PTO says, without a computer, they are abstract ideas. Alice amended the claims to add electronic adjustment, a computer, and on that basis they were granted. So we know two things from the PTO's own action here. First, these claims, these patents, claim only abstract ideas. And second, the only thing the PTO relied on in granting them was the addition of a computer. Counsel, I said these claims contain only abstract ideas, right? Do you mean just the one patent you're referring to or all the patents? Your Honor, all the patents have the same thing. Well, why don't we look, because, gosh, we're supposed to decide in validity claim by claim, so why don't we actually look at a claim? How about we start with claim 26 of the 375 patent? It begins, a data processing system to enable the exchange of obligations between parties. The system's comprising a communications controller, a first-party device coupled to said communications controller, a data storage unit having information stored therein, and then it gives you a couple of subparts about what kinds of information, a computer coupled to said data storage unit, said communications controller that is configured to do the following. That doesn't just sound like somebody saying a method with maybe a computer. I mean, there are four separate physical, tangible components of a system articulated. Your Honor, you're right. There's a computer, a hard drive, and a telephone. Actually, no. All of which is divided. We know that that's not right because we have the certification patent, which, if you look at columns 7 and 8, span two full columns of exasperated detail about how, for example, the processing unit 20 comprises three interlinked data processors, such as the Sun 670-MT, manufactured by Sun Microsystems. Each processing unit runs operational system software, such as Sun Microsystems' OS 4.1.2, as well as application software. The application software is shown in the flowcharts accompanying this patent, i.e. figures 8 through 16 and figures 18 through 40, which contain detailed flowcharts that would certainly satisfy anybody's predilections regarding an algorithm disclosure for software purposes. Wow. This is so far from just a computer doing an abstract idea. I can't even imagine how you could characterize it. I respectfully disagree. The Sun SPARC workstation described there was just an off-the-shelf computer in 1993, and it says any computer. It doesn't specify the Sun system. It says any computer. The flowcharts that are described, the only ones that Alice says have anything to do with these claims, and I'm looking at the 479 patents, but they're the same figures, is figures 33, 34, 35, 36, and 37, Your Honors. These flowcharts, if I could point them forward, is a good example of figures 36. How is the Sun microsystem an abstract idea? How is a computer, I walk over and here I'm carrying with me a ginormous system. It has four tangible components, four separate machines accompanying the system. How is that an abstract idea? Your Honor, the question is not tangibility. A computer is clearly tangible. What the Mayo Court said on this very subject, Mayo explained, this is a quote, Benson held I don't remember any system claims in Mayo. Am I mistaken? Your Honor, Benson was effectively a system claim because the court made clear that it ran only on a digital computer, and what Mayo said characterizing Benson, this is a direct quote, Benson held, quote, that simply implementing a mathematical principle on a physical machine,  So, yes, there is a Sun Spark workstation being described in the spec, but it is first a generic computer simply put into the such ad, and second, the representation of a computer. So, if I go to the PTO today and I want a patent of 386 old-fashioned Dell PC, I walk up and here I am with my patent claim directed to the Dell 386 component by component, all of the, I hope that doesn't reflect on my question. A super bold moment, Your Honor. Well, let's hope I don't go the way of the poor ravens after that flight went out. But anyway, so, because up until now I wasn't a raven, just to be clear. Anyway, so, let's say I walk up to the PTO and I want a patent of 386 computer, and is the PTO likely under, we're not talking software, is the PTO likely under that circumstance to say, gosh, no, I'm sorry, that's an abstract idea, one-on-one rejection. Of course not, Your Honor. So, why would adding software, i.e. limiting the functionality of that computer, suddenly convert that computer into an abstract idea? Because, Your Honor, these claims, and it is, of course, the claims, the control, not the specification, do not recite any specific computer, a Dell 386 or any other, nor any specific hardware or software. They say electronic adjustment. That can be done on a calculator, that can be done on an editing machine. That appears in all the claims of the 510 patent, which are the ones the applicant amended over the section one-on-one rejection. That was the addition that the PTO allowed as being solely sufficient to overcome the abstract idea. Electronic adjustment, not the editing machine, Your Honor. Mr. Perry, is it your view that there's a distinction between a claim, a freestanding claim to computer qua computer, and dealing with a method claim, which is what we have here, and whether a system and a computer claim appended to the method claim, drafted to avoid the problems of the method claim, are patent eligible? Yes, Judge Lurie, and let me illustrate that by a simple example. In the diagnostic method in Mayo, if the patentee had recited a system configured to correlate and diagnose and so forth, that claim would have been no more patent eligible, we submit, than the claim that the Supreme Court in fact invalidated. The addition of a generic system, an undescribed, undisclosed, unclaimed system, doesn't add anything to a method claim. So in a patent like this, we have to start with the method claim. To answer your question and Judge Moore's, I think there are other kinds of patents in which what is actually being claimed is the computing device, or even the programming of a computing device. Allopat, or some of the language is wrong, the outcomes. He was starting with the method. Here we start with the method, because here the patentee started with the method. These patents, there's four patents. But I thought we started with the claim. Your Honor, the first patent issued. Did we go claim by claim? The first patent issued was the 479, which is solely the method patent. All the rest were continuations. They filed terminal disclaimers. But nonetheless, the different patents have different claims, and they each have to be considered, do they not? Absolutely they do, Your Honor. But here, we would start, we submit, starting place is the method claim, because where the patentee started was the method claim. Let me ask you a question with respect to the method claim. In the district court, and on appeal last time, and I understand, again, in your en agreement, agreeing that, at least for purposes of the assessment of section 101, claims 33 and 34 of the 479 patent are the same as the other method claims, all computer implemented. That's correct, Your Honor. Now, let me understand the extent of your agreement here. Are you agreeing that we should treat those claims as computer implemented solely for purposes of this issue 101, or for all purposes in the case? And I ask you that because if we should reverse on patent eligibility, based upon that concession, will the case go back? Will the district court construe those claims? And what happens if the district court construes those claims and says, well, no, there is no computer implementation in that year? What happens then? Do you reassert the 101 argument? Your Honor, we have conceded, for all purposes in this case, that the claim 33 and 34 of the 479 patent inserted there are assumed to require a computer. That was the district court's holding. So it's for all purposes. Now, there's an important second part of your question, though. Can I follow up on that? Because you said assumed to require a computer. But as I read what the district court says, and she used the word assuming a very broad construction. I think she meant narrow construction, actually, when you think about it. But she said that you conceded that the terms shadow, credit, and debit record, and transaction all recite electronic implementation on a computer or some other electronic device. And then she later pointed out that even at the marketing stage, you said that let's assume that we have to have all of these activities implemented through a system on a computer. That's correct. Because the 510 patent, and this goes to Judge Moore's point, there are a series of continuation patents. And the later ones do claim electronic ingestion in the computer system. So we don't dispute they're computer implemented. There's an important second point, though, which is the Benson claims were computer implemented. In fact, Justice Douglas wrote for the unanimous court there, they only worked on a computer. But they could be done by pencil and paper. And that was key. And the analysis expert here. Well, let me follow up on my question and ask you this with respect to claim 68 of the 720 patent. And that's a data processing system claim. Yes, Your Honor. What if that claim, instead of reciting a data processing system, recited a data processing circuit, and then went on to claim a storage unit, and then instead of the limitation, a computer coupled to the storage unit that is configured to do this, that, and the other, it's a hardwired electrical circuit configured to do this, that, and the other. Would there be any question whatsoever of 101 patent eligibility? I think at that level of abstraction, that level of generic description, there would be, because it's being claimed there. It would? Claiming a circuit with a specific hardwired device? Unless the device is claimed, or at least disclosed, neither of which we have here, of course. No, but my hypothetical proposal is that the limitations are in hardwired electrical form. Your Honor, whether it's hardwired or softwired, I agree with Alipat to the extent that it makes no difference. Whether the circuits are physically wired or instructed by software, that is irrelevant for patent eligibility. What matters here, though... Well, that was going to be my follow-up. Oh, well, I'll grant you that one, Your Honor. Because I don't think there is a principal difference. I agree with you. In both cases, you have something more than simply a token computer tagged onto an abstract idea. As Judge Moore pointed out, there are specific limitations as to the way this method is performed in the system and using the software to accomplish a practical result. Your Honor, I absolutely agree that there are computer system claims, computer software claims, circuitry claims, all of which are patent eligible. We haven't challenged any of those. We have made the point over and over again. And neither Alice nor the government has challenged any of those. The claim I just read to you is a computer system claim that articulates four pieces of hardware, and the specification discloses at least 15 different things that could be used in each of those four... Judge Moore, I just disagree with that characterization. How is that not a system claim? That is a method claim dressed up in a generic system. It says use any computer, any telephone, any hard drive, and then look at the programming claims. Look at figure 36. This isn't a logic flow. This is a parody of a logic flow. This cannot allow a person skilled in the art to program this computer. This simply says, do we have multilateral netting available? Put it in the black box and see what comes out. The black box is never claimed. The black box is never described. The claim I told you about, this is the flow chart for it. Let's look at figure 12 of the 375 patent. I've never seen a flow chart in any software case with any more detail than this. Judge Moore, that drawing has nothing to do with these claims. Alice doesn't say that has anything to do with these claims. There's a whole bunch of other claims that aren't asserted here. This claim is asserted. The one I pulled, I had my law clerk check four times to make sure it was asserted before I pulled it. I'm sure your law clerk was asserted. After four times, he's sure it's that letter. It certainly is not one of the drawings that Alice has pointed to in any of his briefings in this case. So I apologize for my mistake in that respect. Let me add this point, Alice. PTO didn't look at this as a software claim. PTO looked at this as a method claim because the resolution was on the method. And Alice is defending it as a method claim. That's for a good reason. The government makes the point, quote, this is in the brief at page 9, that Mayo has changed the law from what it used to be. When these patents were enacted, the recitation of a computer, any computer, Judge Moore, was enough. That's the basis on which PTO granted these claims. And the government now takes the position, the United States government, quote, the recitation in a claim that a system is computerized can no longer serve as a virtually dispositive indicator of patent eligibility. Although that approach had the benefit of simplicity and ease of administration, it is no longer viable after Bielski and Mayo. Did Mayo overturn ALIPAT then? Your Honor, ALIPAT's outcome I think is correct. I think there's some reasoning in ALIPAT. Certainly the useful concrete tangible results standard has been rejected. But the process and apparatus described in ALIPAT, that is the rasterizer optimized for the smooth oscilloscope presentation, I think like the Resource Corp. patent, looks a lot more like a method for an improvement in computer technology that under the Benson, Flug, Deere line of cases would have mustered. So I don't think it did overrule ALIPAT's outcome. I think the reasoning of ALIPAT has not survived. And this Court, in fact, in Bielski, of course, recognizes the reasoning of ALIPAT has not survived in these years. But the outcome probably does. But this is not ALIPAT. And it's a useful distinction between this case and ALIPAT and Research Corp., for example, where a computer is necessary. And I'd like to get back to this point, Judge Warren and Judge Lynn. Alice is an expert that they like to talk a lot about. They never tell you about this quote, which is at page 1012. He says, quote, in an abstract sense, it is possible to perform the business method of doing these things, that is, maintaining accounts, adjusting accounts, and providing instruction, without a computer. In fact, if you'd done this 100 years ago, which, of course, we'd have to look at, you would have done it in a non-electronic manner, using various pre-computing tools, such as an abacus or handwritten ledgers. So you're talking about a method. Yes, Your Honor. And our anchor is the abstract exception of the Supreme Court. And we can go to mental steps from abstraction. Mental steps surely are abstract. But then we go to keeping records, and we go into a filing cabinet, and we write things down. Those aren't mental steps. How do you progress from mental steps to these fairly trivial? We're not talking about prior art here, either. Your Honor, it is fairly trivial. It's double-entry bookkeeping, which every accountant can do, is all they've claimed. And they don't claim any number of transactions. The claim would read on a two-party, single tray. So you don't need a pencil and paper, or a ledger, or abacus, or a calculator to do that. Mr. Perry, that's not correct, to sort of distill the claim down to that, simply a double-entry accounting. The claims have specific limitations. Your Honor, the claims? What is done when, in what order, to accomplish what result. You can't ignore that. Your Honor, the claims recite credit and debit accounts, chronological bookkeeping, and an end-of-day netting. That is all they recite. No, that's not all they recite. If you want to read the claim, we can read it, limitation by limitation.  Your Honor, let me, if I could. Every claim and every patent can be distilled down to some essential summary, if you want, but that's not the way we assess either patent eligibility or patentability. Judge, let me point you then, not to my words, but to the patent holder's words. In the specification, it's in the same columns that Judge Moore referred to earlier, in the 375, in the 479, in the Calendars 24 and 25. They say the method has two steps. This is Alice's summary of its own method for the world. It is disclosure. It has two steps. It is a two-stage process. They say, quote, first, by debiting and crediting on a real-time basis, the relevance records, shadow records, and second, by periodically affecting payment. Okay? All that is being talked about is when a bilateral transaction, the intermediary debits and credits the account during the day and makes a net payment at the end of the day. Judge Lin, embedded in your question, if I may be presumptuous, in the course of the panel opinion that you wrote, you say there are many other ways to do that, that is, to keep accounts and write them. We challenged that proposition in the Inbank petition, and Alice has come back and admitted they only know of one other way to do it, and they cited a very interesting article, the Schaller dissertation, which is quoted in their brief, which says that for multi-party, multilateral, multinational currency settlements, which is what we're involved with here, there are only two ways known to the world to do it. Real-time gross settlement, which is what the Fedwire does, every trade is immediately entered and closed, and that's the way central banks typically do it operating in the same time zone, or net settlement, which means you net them up during the day and settle at the end of the trading period. The G20 met in 1989 and decided those are the two options, and that net settlement is better for multinational currencies because of the time zone differences in which all the members operate, but also reduces credit risk. Those are the only two ways to do what is involved here. They don't dispute that. Look at page 40 of their brief. That's the other alternative they take. So we talk about preemption. They are claiming net settlement,  There is no way to do a net settlement accounting without a shadow credit record. This is simple double-entry bookkeeping. You've all bought a house, I assume. If you had a HUD-1 statement, that's a shadow debit and credit record. You've got the taxes and the utilities and everything, and it comes out to a bottom line, and the money flows one way or the other. The escrow agent holds it. That's what's being claimed in this patent. It is abstract. It is simple. It is not complicated. And it is preemptive. And adding, bolting on a general-purpose computer, undescribed, any computer running any hard drive and any telephone, without software to actually do it. This is important, your honors. There are companies in this country and others that spend tremendous amounts of resources, money, time, assets, to develop real things. And it's hard. That Schaller dissertation that's quoted in their brief says that just building the CLS Bank system cost $200 million before it even started going. Instead of a McKinsey-Cohen consultant writing a business plan, and now bringing it to this court and asking for royalties, which is what they're doing. You know, I can have a great idea. A self-driving car, that's a great idea. But Google is investing a billion dollars to actually bring it to reality. And if they do, they'll probably get a patent on it. But the person who just broke down the idea and brought it to the PTO shouldn't. And one thing that Bilski and Mayo do, and they are divisive opinions. I understand that. I understand that there are differences of view on that. But one underlying point made by the Supreme Court there is that there is an innovation, a creativity requirement that rewards actual invention. And we submit that these patents don't display invention. They display... Isn't 102 and 103 the thing that's supposed to take care of what you're describing now? Absolutely, Your Honor. And if we ever got Task 101 here, Alice has got all kinds of problems on obviousness, on enablement, and everything else. That is a logical way to look at the patent act. I've actually written briefs making that point myself. However, the Solicitor General made that argument to the Supreme Court in Mayo, and for better or for worse, but they told us what to do, they rejected that. They said, no, we're not going to rely on 103, 102, 112. We're going to have to apply 101 at the threshold and screen out those patents that are purely abstract. And this is purely abstract. Did the Supreme Court really say you have to apply 101 before you can apply 102, 103? Or did it simply say that because the Supreme Court has created judicial exceptions to what is otherwise patentable under 101, 102, 103, that it has to have independent life? Your Honor, they didn't say exactly at the timing, although in every 101 case the Supreme Court has ever decided, and almost every one this court has ever decided, it has been the first issue in the case, for good reason. Because it's a legal question that can be decided on the claims in the SPAC, in a few amount of dictionaries or treatises. It doesn't require all the evidence and the expensive machinery of patent litigation. If the patent clears, then the litigation starts. If the patent doesn't clear, game over, we move on. Would you wish to keep some of that? I appreciate the reminder, Chief Judge Rader, thank you. I think we'll hear next from Mr. Kelly. Then we'll hear from you, and then we'll have a rebuttal. Good morning, Chief Judge Rader. May the Supreme Court of the United States appreciate the opportunity to present to you here this morning. In arriving at our views, we've looked to the past first, and we've looked to our efforts as an agency, and this court's efforts even, to create a bright-line test that can be used in all cases. And we go from the useful, concrete, and tangible tests that we had about a decade ago, the machinery transformation test that we had several years ago, and we look from those tests to the Supreme Court's guidance. And we've come away from that with a clear understanding that a bright-line test is not workable in this situation. Is that the only clear understanding you came away with? No. No, Your Honor, it's not. We've come to another understanding, which is that we also can't look to the draftsman's art to take a claim and push it into the eligibility circle, that we have to dig into the claims themselves. The fact that a claim simply recites a computer along with an abstract idea is not going to make that claim patentable as structure, whether you write it in a process claim or whether you write it as a system claim. But isn't that a function of the claim construction? It is a function of claim construction, but it is not the only thing that needs to be done in order to assess the 101 question. Yes, the claim has to be construed. We have to know what the claim means. We have to know if the computer is there and how it's connected to the other elements. But then we think that we have to ask an additional question. How is the computer working in the claimed invention? Is it inseparable from the claimed abstract idea, if there's one there, or is it just simply added on to the claim? What I don't understand, Mr. Kelly, is when you have a system claim that is nothing but hardware, and it's articulated in four different pieces of hardware, and then you have a specification which spans two columns of detail and includes flow charts for how the software will operate. How could that ever be an abstract idea? Your Honor, the Supreme Court was clear in Mayo that just because a claim recites something that may not be a law of nature does not mean it's a claim to a law of nature. The fact that the Mayo claim had a step that we see in many, many eligible inventions of administering something to a patient did not take that claim and put it into the eligibility circle. Well, because there it was insignificant activity that accompanied a method claim. But when the claim is to the system itself, and all four elements are detailed descriptions of hardware, it seems hard to me to say, oh, well, that's just an insignificant part of this claim, because the claim is to a computer. Well, if the claim is truly to a system, and that's how the claim is construed, and there are further findings that the system is what's happening in the claim, then I think we agree with you. The problem is, Your Honor, is if you take an abstract idea and simply write a system, however detailed you want to write that system, at the end of the day, if the system is just there to add on to the idea for the purposes of making it eligible, we think that the Supreme Court has clearly stated that that is not enough. You have to look deeper into the claim to see if the system and the steps are inseparable. Like this Court has said in cases like ResearchCorp or CERC, can the ideas in the claim be separated from the system, separated from the GPS structure, separated from the computer that puts its display up, and standing alone, that is the idea behind the claim? Or is the recitation in the claim alone what they're trying to seek a patent on, and the computer is simply there as an implementation detail? So, Mr. Connolly, at what stage in the government's position is the decision made as to whether it is in fact an abstraction? You tell us we don't look at the form of the claim anymore. We just look at the concept, but do we also look as to how much detail or flesh or whatever is attached to the concept? This is what has troubled me from the beginning. There is a point at which one moves from the abstract to the concrete, and I appreciate your comment, and I agree, that there is no bright line. Perhaps it depends on the subject matter, perhaps it depends on the state of the art and the prior art. But where does 101 fit in? Because it does seem as if you're saying that if it fails 103, it's probably an abstract idea because it's too broad. That, I don't think, is where you want to go with this reasoning, and yet it seems to be what I hear. Well, there's two issues in your question, I think, Your Honor. First is where in the course of a proceeding or where in the analysis of a patent does the 101 analysis have to take place? And we don't think that the 101 analysis has to come before the 102 analysis. Indeed, the way the Patent Office has to approach these things is in a way that makes prosecution as compact as possible, and we would hope to make every rejection at once at the same step. The other part of your question, perhaps, Your Honor, is how do we separate out the particular details in the claim from the other rule that we've suggested, which is the form of the claim doesn't matter. Well, and maybe you don't need to, based on your answer to the first question. Don't bother with 101 until you see whether you have patentable subject matter. Well, we think a district court should be able to, if they have a clear 102 issue in front of them, reach that issue, which might be much simpler to reach than the 101 issue. But we don't think that the 102 analysis is a proxy for the 101 analysis. What we think should be done when the 101 analysis is looked at is the claim should first be construed. And then after the claim is construed, there's a deeper step. There's a step of deciding to what extent does the hardware, does the computer, do all the other limitations in the claim become an inseparable whole to the rest of the claim that could be considered an abstract idea. And if it is inseparable, then you have an eligible invention. But it's in cases like DealerTrack, Fort Properties, Bancorp, CyberSource, where what's happening is that you have a standalone idea in the claim. Not just an abstract claim, but a claim to an abstract idea. And the computer is added simply for the purposes of getting the job done or because you have to have a computer, because everybody in the field uses a computer. The computer has to do more than simply be a calculator in an eligible process. I think that's a fair way of looking at it. What we've suggested in our steps, we've suggested a multi-factor test that includes a number of different things that the fact finder can look at. We've suggested three of these factors weigh in favor of eligibility.  Because it calculates faster? Computes faster? Well, that's an interesting question. If you had an algorithm that actually made the computer work better, if you figured out that, for example, certain steps might be higher energy steps than others, so you interlace your higher energy steps with your lower energy steps so the computer would use less energy and be more efficient,  to improve the processing of the computer. But if your invention is a particular mathematical formula that you're going to implement with a calculator, then clearly, no. No all the time or no just right now? Because certainly the first person that came up with the calculator was able to get a patent on it. The calculator itself wasn't an abstract idea, right? Correct. Even though all it was doing was addition initially. It didn't even do subtraction in the first calculator. Okay. I step back. Now the second calculator person comes along. The guy at MIT that opens up the back of the calculator and says, hey, with a simple amount of reprogramming, I can make this thing do subtraction now. Well, subtraction is an abstract concept, clearly. But he just built the machine. It's just a small variation of an existing machine, but he just made a machine that can do subtraction. Is that an abstract idea, that machine? It would depend on the facts of the case and the claim as written. As you posed it, it might very well be eligible. If someone can figure out how to make the computer do something that it could not do before. But isn't that what every new software program does? Every new software program reconfigures the computer. Take off the back. Pull out the chips that aren't necessary. It changes it. That is the heart of Judge Rich's special purpose computer in Allopat. Do you reject that idea? We do not reject the totality of what Allopat said, but we do think that you need to look deeper into that case. The Allopat case, there were some very special things going on in that case, and under the facts of that case, that may very well have been eligible. What we do reject is the notion that simply adding a general purpose computer plus software, such that you have now a special purpose computer, or if you want to implement it in hardware, in hardware, that that alone makes it eligible, regardless of the details of the computer, regardless of how well the computer works. You just said a general purpose computer plus software would never be eligible for patent protection. So what you've effectively just told us is software patents are dead. I did not say that, Your Honor. Actually, you did. They had a transcriber. They repeated that. Your Honor, well, if I did, forgive me. What I should have articulated better, perhaps, is that adding a standalone general purpose computer to an abstract idea is not going to give you an eligible claim. Is the distinction between the computer being simply a token post-solution implementation or whether the computer is part of the solution? Yes, Your Honor. That's how we've looked at these cases, that post-solution activity, the genericness of the computer, this sort of place onto the idea doesn't render it patentable. Certainly, if you have an algorithm, if you have an idea that when you implement together with a computer, makes an inseparable whole, that can very easily make something eligible. Would it be fair to say in this subtraction example that someone could not get a claim to a, quote, machine that does subtraction, but that if you have a particular way of programming your computer so that it does the subtraction, that that may be patentable? Exactly, Your Honor. And I see I'm out of time. If I add, may I add? Please. Yes, and we can distill an abstract idea from almost any invention, and we can look to the first half of the 19th century to see that. Morris, when he invented the telegraph, claimed it in a variety of ways, and one of the ways he claimed it was as an abstract idea, the idea of using electromotive force to create characters at a distance. The fact that there's an abstract idea behind the invention does not answer the eligibility question at all. What answers the question is the claim, what's claimed, and how the claimed parts work together as a whole. Thank you, Mr. Kelly. Thank you. Mr. Perlman? You may proceed. Thank you, Your Honor. Good morning. May it please the Court. I think, at least as to one aspect of the case, the fundamental disconnect between myself and Mr. Perry is the level of generality with which he reads our claims. We have not claimed the idea that the district court identified of using a neutral intermediary to exchange obligations. We have not claimed the idea of using a computer as the neutral intermediary, nor have we claimed every way of using a computer as a neutral intermediary. Mr. Perlman, let's start with basics. You won at the panel level, and the majority opinion said that while method, system, and media claims fall within different statutory categories, the form of the claim does not matter, and labels are not determinative. Do you agree that, in this case, the three forms of claims, that they all fall together? I hope they all rise. Rise or fall together. Rise or fall together. But I do not agree with that. Hang together. Yes, Your Honor. I do not agree with that as to the system claims, and let me explain why, if I could. The statute says that machines are patent eligible, and the definition of a machine under the statute, under the Supreme Court and this court's case law, is a concrete thing consisting of parts. But do you think there's a difference between, as I asked before, a freestanding computer or machine claim, and one attached to a method claim, as we have here, where it's clear that the machine is simply a reconfiguration of the method claim, which may or may not fall? That there's a difference between that and a freestanding computer claim examined on its own merits? For purposes of 101 and the abstract idea exception, I do not believe there's any distinction between those two. Let me give you an example that I think illuminates my reasoning, which I think is similar to what Judge Moore had brought up earlier. If I were to claim a computer coupled to a data storage unit, full stop, and assume I was the first, there is no debate that it is a machine, and that it's not simply an abstract idea, and no one in this case has articulated a basis under which that would simply be an abstract idea. It cannot be, in our view, that if I further limit that claim by specifying what the computer does, that it becomes an abstract idea. As we look at it... You're tossing over the side of the balcony to use the force of gravity. You've just articulated... You've further limited it by adding another aspect to it. You're using gravity. You're attacking gravity. I'm sorry, the question is, if I claim that the computer coupled to a data storage unit tossed over the balcony? Sure. And the claim is to the machine itself. It's a claim to the machine. It's a claim to gravity. It's not claiming the gravity. I mean, that's sort of an interesting machine claim, that it's really claiming the process of tossing the machine. But... So, I guess I'm struggling a little bit with it, so I apologize for that. But I do not think that you can claim the idea of gravity. But I think it's important to note in this case, we haven't claimed any idea remotely like gravity. What we've claimed is one particular way of using a computer to exchange obligations. Jump to page 40 of your red brief. Your... Mr. Perry said that there are only two ways. In your brief, you say multiple other ways. Right. So, what are the... What's the third one, since you've got multiple others? Sure, let me actually clarify. We put two in our brief. The same exchange institution, don't use shadow accounts and just directly make the exchange. The different exchange institution, where the computer instantaneously checks and just operates in the real world accounts, not the shadow accounts. The Schaller dissertation is actually a C also for us, where CLS considered three different ways of doing it, which were not those two ways. They had a way of essentially harnessing the payment systems that different exchange institutions use, and you set up the computer to say when side one of this transaction is set to go, it doesn't go until side two of the same transaction is set to go, and you sort of control it at the payment system level. Why can't you have a human being standing at those levels? I mean, under the current way to conduct international exchanges, there's ways to determine whether a payment has been sent to be wired or not, and there's ways to determine whether the payment has been received at the bank, and there's ways to determine whether a document has been signed and delivered. And that can be done by human beings standing there looking, did he push the button? Did he call and say yes? Right, and I think you're making my point that we have not claimed the abstract idea of using a middleman. We've claimed one particular computerized way. You've claimed a method by which to conduct international exchange transactions that minimizes the risk. We've not claimed the idea of doing that, though. We've claimed one particular implementation. That's the method. The method is conducting international exchange transactions. I disagree. The method is setting up computerized, computer-maintained shadow accounts, which are not the real-world accounts for the exchange, adjusting those accounts. So doing the exchange only in the shadow accounts, not in the real-world accounts. But the end result is you're effecting an exchange. The end result of it is effecting an exchange, but the method is not claiming the exchange only. It's claiming the way of doing the exchange. The way of doing it. And if I can effect an international exchange that I claim minimizes risk by posting individuals at certain points, how is that idea any different from the idea that you're seeking a passport? Well, one, you would not fall within our claim. We're not claiming that idea. And it may be, Your Honor. What's an idea? I understand that. And, Your Honor, I guess what I would say is it may be that the method that you have envisioned and the method that we have patented and the numerous other methods, known and unknown out there, all come from the same kernel of an idea that you want some sort of intermediary or some sort of process in place to make sure these transactions go through. But the prohibition on claiming abstract ideas is on claiming the idea of doing it, not a particular way of doing it. So we may, if I'm understanding your question, the method that you are positing may well emanate from the same underlying concept, but it's not the same thing that we have claimed. But you agree, don't you, that a human being without a computer could do these same steps, maybe less efficiently, but the steps could be done, right? I don't agree with that, Your Honor. Is that what your experts said? No, no. What our experts said is that at an abstract level, the idea of having accounts, adjusting accounts, and giving an instruction can, of course, be done without a computer. That isn't what we've claimed. Why can't this be done by a human being without a computer? Why can't it? Well, putting aside that our claimed method is built for a computer implementation and requires a computer, the question is, is it impossible to do something like this with ledger entries or something with a human without a computer? Of course, it is possible to do that, but the law is not. Unless it's impossible to do something like the claim without a computer, a particular computer implementation of it must be abstract. 1033 of the 479 patents is the method of changing obligations. It doesn't recite a computer, I don't believe. It does not expressly, Your Honor, but it's expressed recitations of shadow credit records and shadow debit records under this specification makes clear those are electronic data files, which is why the district court for purposes of its decision and the panel for purposes of its decision both assumed that it requires computer implementation. That's, in fact, a correct assumption in the entirety of this specification. Would you be free to now disagree with that? In other words, we understand that the district court very expressly said that both sides told the district court, assume computer implementation, even assume that these particular shadow accounts, credit, debit, and the actual transaction between the two is all computer implemented. If we were to read the claim and say, you know what, that's not really a fair assumption. Since claim construction is something we do de novo, could we reconstitute those claims at this point or are we bound by the party stipulations? That's a twist I wasn't expecting at the end. I think for purposes of deciding the 101 issue, CLS has agreed to adopt this construction. Now, what I don't think makes any sense from a matter of efficiency is to assume it for purposes of this decision, send it back to the district court, and then without giving any guidance of whether the result would be different if the assumption were incorrect. But I think that the fundamental issue here is because the specifications describe the shadow records as electronic data files, if it did not require a computer, we would need some sort of additional marking proceeding to figure out what other machine it might require because the definition of the shadow record in the specification is the electronic file. Suppose we were to construe these claims, as Judge O'Malley suggests, as not requiring a machine. Would they pass muster under 101 or would they be invalid? In our view, it would still not be claiming an abstract idea. It would still be valid, even without a machine? Well, it would be eligible. Whether it's valid, of course, has a variety of further steps which we'll get to on remand, I hope. But it would not be claiming the abstract idea of using a neutral intermediary to exchange obligations, which is what the district court identified. It would be a particular way of undertaking one of these transactions. Is there any way of doing the end-of-the-day netting without infringing this claim? I'm sorry? Is there any way of doing end-of-the-day netting without infringing these claims? And by end-of-the-day netting, you mean getting one number representing the net result of each party's transaction over the course of a day? Well, there are innumerable ways for parties to exchange things with each other that wouldn't be covered by our claim. Mr. Perry described two ways that the banking community has considered adjusting these transactions. And what I'm asking you is, I understand one of the ways was end-of-the-day netting, which is, as I understand it, adopted as the international standard. Is there any way of doing that without infringing these claims? I guess the direct answer to that question would be that there's nothing in the record on that. But I would say that the two methods that Mr. Perry points out in this document, actually there are three methods recited by the entire document. Well, what's the answer to my question? I guess, Your Honor, the difficulty I'm having is we don't claim the concept of netting at the end of the day in the abstract. And so I'm certain that there are ways to structure currency transactions that don't use our precise configuration of shadow accounts and real-world accounts because the TLF identifies them. Are you able to identify any methods of doing this that wouldn't infringe your claims? Sure. The first method in the Schaller dissertation, which is... No, but you seem to be changing my hypothetical. No, no. This is an anterior hypothetical. That's one of the methods that the banking community looked at. But my understanding is that the two methods, one of them involves end-of-the-day netting, correct? But that's not... No, there are three methods, and one... Now, just accept there is one method that involves end-of-the-day netting. There is one, yes. Is it possible to perform that method without infringing your claims? Yes, because that method is the first of the possibilities that CLF considered, and they ultimately adopted the third, and the third is the one that infringes our claim. So, yes, but, Your Honor, I also would say... The international standard that exists now, the way it is recommended to be done, is there any way of doing that without infringing your claims? I don't know the answer to that question, Your Honor, but I would say that that should not determine whether in 1993, when we filed this patent application and laid out a particular computerized way to go about doing this before CLF ever came online and before the international standard was ever adopted, is simply an abstract idea. But the direct answer is I don't know the answer to your question. Let me... Let me go to... to the point that Mr. Perry made about the creativity requirement. I think he called it from Mayo. I think we fundamentally disagree on what the Supreme Court was saying in Mayo. And as we read Mayo, what the Supreme Court has said is when you have a claim that involves, in some major way, a law of nature or an abstract idea, you have to have other elements in the claim that suffice to show that the claim as a whole is just significantly more than the abstract idea itself. And the question is not, is each individual element, or even all of those elements, invented in the sense that Mr. Perry is using it, but rather, do they have a significance to the claim as a whole such that you're not just simply claiming the law of nature itself? I take that from the fact that the court in Mayo expressly quoted the provision of deer where the Supreme Court said, even if all of the elements of the claim are well-known and in common use, it is still possible for a process combining them to be patentable. It seems to me that acceptance of that concept fatally undermines the argument that we see in CLS's opening brief, and less so in the reply, that the relevant question here is, is the computer conventional? Is it conventional to have an account? Is it conventional to make adjustments to accounts? Conventionality in Mayo of one of the steps was relevant because the patentee conceded that these were well-known routine steps that necessarily would have to have been done in order to use the law of nature. And so, the fact that those steps were known was relevant to determine whether the claim was to significantly more than the abstract idea itself. When you perform that analysis here, our claim is to significantly more than just the abstract idea of using a neutral intermediary. We have a computer that requires special programming, not an off-the-shelf program, as CLS suggests in their brief. We lay out in great detail in the specification how to go about configuring the computer, and Allocat says that creates a new machine, configured by its programming rather than by its hardware. That serves to demonstrate that our method claims, our system claims, our media claims, are all to significantly more than the abstract idea itself, which is why the district court prepared in this case, and the panel was correct in our view. But let me say that even if one were to use a conventional computer in a claim, that is not the analysis under 101. The question under 101 is, has the patentee applied computer technology in some practical way, such that it is not just a claim to an abstract idea, but to an application of that idea. The statute itself says that a new use of an existing machine is eligible within the definition of a process under section 100, subsection B. So Benson was decided incorrectly. No, Benson was a claim to a mathematical formula that at most recited a shift register, which is a storage device, and what Benson fairly read is to say, which we agree with, that your claim is to a mathematical formula merely tagging on, and the computer will perform the calculation, is not significantly different than claiming the abstract idea itself, and it would fall under Benson, and it would fall under our view. But our claim is not to some calculation or calculating some number, and the computer in our claim does not simply speed an underlying calculation. Our computerized method, in our view, is more effective than the analogous method that would be done without the electronic implementation such as with the ledger entries that we talked about. When you say it's more effective, again, aren't you talking about that your method is designed to minimize risk? Minimizing the risk that's inherent in these type of international exchanges? We are minimizing that risk, and we are providing other benefits. And that's really what you're seeking to invent, a method that minimizes risk in international exchange transactions, correct? The goal of our invention is to minimize risk, but our invention is not the idea of minimizing risk. Isn't that just an idea? Let's go and minimize risk, and I may have that idea, and I can do it with human beings, and you have the idea, and you want to do it with a machine. What's the difference? That's not what we've claimed. We have claimed one particular machine-implemented way. The claims are directed towards the result. Isn't that result that you're seeking to minimize risk in international exchange transactions? The result that we are trying to achieve, yes, is the minimization of risk. If I have a similar idea, and I go and I post individuals around the countries, isn't that the, aren't you, haven't you just simply attached a computer to the idea and you're achieving the same result that I can achieve with human beings? No, because what I have done is, let me try to do this in a different way. If our claim were to a method of minimizing risk in exchange transactions using a computer, full stop, I would agree with you that all we have done is identify the concept and said, and use the computer in the concept. But that is not what we have claimed. We've claimed one particular way of using a computer to exchange obligations a certain way to achieve the goal that you identified of minimizing risk. If, your honor, you were to post people around the country and do it in some different way, you wouldn't infringe our claim. And nothing that we do in our claim precludes others from coming up with new methods of using computers to exchange obligations or using other methods that aren't involving computers to exchange obligations. We have one particular way we believe to be advantageous, but the law wouldn't require for it to be non-abstract for me to be right that it's advantageous, and that's all we have claimed. We haven't claimed the idea itself, and that's what the prohibition is on. So what were your other two ways? Sure. You say you've claimed one of three. I'm sorry? You've claimed one of three. We, no. We've claimed one way of performing these types of exchanges using a computer. The document that we cited, which was just an evidence that there are multiple ways to do it, has three different ways identified, but there's nothing in the record to suggest that that is the universe of all possible ways ever. And I don't think that the analysis turns here on whether, because we came up with our idea and it's the best idea, that's how everybody does it. But I can tell you what the other two options were in the paper that we cited, if that is the question. The first option was that the computer system interacts with the party's real world accounts, not shadow accounts as we have it, and set up to coordinate payments from the accounts, such that either both go or only one goes by using the payment system. The other way that is in this dissertation that CLS published about its own history is what the system does is tracks what each party is obligated to pay in to cover their net obligations over the course of the day. And there's a deadline for them to pay that in. And if they pay in what they owe, then they get back from the system what they are owed from other people. But if they don't pay in what they owe, they don't get anything back. And then the third model is the one CLS ultimately adopted, which infringes our claim, which is the settlement of transaction by transaction using the shadow records. And there's no other way to do that without infringing your claim. There's no way to do our claim without infringing our claim. There's no other way to do that method that you described without infringing your claim. To do CLS's particular method of settling trades infringes our claim. But there are multiple different ways to set up a system to exchange foreign currency. The fact that CLS chose the one it thought was most advantageous, and that happens to be the one that infringes our patent, and so that's what everybody uses, doesn't mean that we've claimed the abstract idea of settling foreign currency trades. But didn't that fellow with the green eye shade carry shadow accounts in his mind while he was sitting in his little chair? No, I don't think that's correct. Shadow accounts are not new, right? Shadow accounts, which are electronic accounts... Forget about the electronic part. Shadow accounts are not new, right? Well, shadow accounts in our patent are electronic accounts in a particular method. Ledger entries, which I take it as the thrust of the question, are not new, and we don't claim to have invented them. But what you have is shadow records, which are electronic records, for use in a particular computerized method, which is all we claim, and all we prevent anyone from doing. And I do think that there is a distinction that the panel pointed out that I think put this in terms at least I found to be clear. The distinction is whether a claim is drawn to a specific way of doing something with a computer, which is what we have, as opposed to nothing more than the idea of doing that thing with a computer. And I think that is a critical distinction, and I think that distinguishes a number of the cases that Mr. Perry has cited, and I think it is what makes clear in this case that all of our claims, method, system, and media, are not to an abstract idea, but to a particular application. Let me take you back to the question that was posed here with respect to the ad bonus. What do you believe the test should be in this context? In our view, the overarching test for any claim is the claim, with all its limitations taken as a whole, to significantly more than just an abstract idea. As applied to the computer context, the question as we see it is, is the computer playing a significant role in permitting the claim invention to be performed, or is the computer simply there to do a calculation faster, or simply there to print out a result? And it seems to me that it's important when you look at that test not to indulge in what we saw in the replies, which was the sort of focusing in too granularly on the fact that, well, of course, computers store data. Computers manipulate data. Computers output a result. That's, frankly, all computers do. And Mr. Perry says, aha, you're admitting that that isn't enough, and therefore your computer isn't enough. What we use is a computer in a method of exchanging obligations set up for use on a computer, and the computer is central to that method. It creates and maintains the shadow account, adjusts them only if particular criteria are met, does it in a particular order, issues the instruction to complete the transaction. It is applying computer technology in a way that is beyond what we saw in the Bancorp case, which was a claim to a series of mathematical computations, and at the end, you essentially had, and the computer will do the calculation. It's curious that you say the computer is central. This is a very detailed claim that doesn't mention computer. That surely is no accidental inadvertence. Well, the claim, the claim requires a computer, whether it says the word computer or not, because of the presence of the shadow records. And given our specification, there's no getting around that this claim requires a computer implementation, whether it's there or not. And I would say that if the word computer were in the claim, Mr. Perry wouldn't be taking any different positions. Well, I think that your last point isn't made most strong by the fact that he takes the same position on the system claim, which clearly has a lot of tangible physical components to them. I guess my question to you is, isn't this a case, like every patent case, where we ought to look claim by claim and not make a sweeping judgment based on either the broadest or the narrowest of your claims? I do agree with that. So if we do that and you don't claim a computer, then you're asking us to assume a computer is utilized. Isn't that also asking us to assume whether it's a general purpose computer or a specialized computer or a specially designed computer, if you don't claim it? I don't think that's correct. Let me say, for the 510 method claims, CLS agrees that they require the use of a computer. As for the 479 claims, that's clearly the correct construction. CLS agrees to it for purposes of the 101 analysis. But it seems to me that the question is not whether the word computer is in the claim because this court engages in Markman determination every day. And the question is, does the claim properly construed require the use of a computer, not is the computer in hot verba in the claim? On the specially  I'll make two points. One, you heard Mr. Perry say this is all off-the-shelf stuff. You cannot go down to Best Buy and pick up a computer that does this. You have to specially program this computer our particular way to make it do this. And our specification lays out in great detail how to go about doing that programming. So, under ALAPAT, it is a specially programmed computer. It is- It's not part of the claim. Well, of course it's part of the claim because the claim- The particular way of programming the computer is part of the claim? No, no. The claim says- It is not part of the claim. The particular way of programming the computer is not part of the claim, right? The claim tells you how the computer has to be configured. And the specification tells you how to go about doing that configuring. But you have to do the steps described in the claim. Apart from that, there's no special programming, right? Well, there's no source code in the claim. That's correct. But it does describe that the series of steps that the computer has to be configured to do, which is a particular series of steps. And certainly, it's not the case that if we have a specification as detailed as we have with all the description that we have and the flowcharts that we have, and there's no evidence at all in the record, by the way, that that would be insufficient for a skilled artisan to use it to practice this claim, that we have to write the entire specification into the claim. That would be a great departure from this course's usual approach to plain construction, certainly, and in this context. Let me just make one final point because my time is winding down. We saw, in the reply brief, the argument that the presumption of validity does not apply, and I just want to hit that at the end. The statute applies the presumption to all patents, and this court in Arismia applied the presumption of validity to an eligibility determination under 101. The premise for the argument on the presumption was that Section 101 is not a defense under Section 282 of the statute. This court, an aristocrat and a dealer track said Section 101 is a defense under 282 under the statute, and the ironic thing about this argument is if Section 101 were not a defense under Section 282 of the statute, CLS would not be able to run it as a defense in this litigation. It seems to us that, particularly because we have an issued patent, we have a presumption of validity, and we simply do not claim an abstract idea but a particular way of exchanging obligations. The district court erred, the panel was correct, and the claim should be upheld under 101. Thank you, Mr. Cronin. Mr. Perry,  five and a half minutes. Thank you, Your Honor. We have an issued patent the United States government agrees was issued under the wrong standard. What you did not hear Mr. Kelly say is that these patents are eligible. I would submit that silence speaks volumes that these patents are not eligible. But it's not your view that if we agree to accord the presumption of validity to these claims that you lose. No, Your Honor. We have simply So you would accept the burden for purposes of You can look at it that either we have overcome the presumption by showing that the wrong standard is applied or that validity is a different question than eligibility therefore the presumption doesn't apply but we've overcome it either way. Mr. Perry, in your briefs you argued strenuously that the test for determining when a computer implemented invention is more than an abstract idea depends on whether it contains some sort of an inventive concept. And I didn't hear you in your principal argument here today mention the phrase inventive concept once. Have you abandoned that Not at all, Your Honor. I sort of thought  But isn't inventiveness what Sections 102 and 103 are all about? The Mayo Court we think used inventive concepts to determine whether a computer implemented invention is more than an abstract idea and the idea of significantly more than the abstract idea as synonyms. And that's a line that goes back to Benson as well. So maybe we should just focus on significantly more and not get confused by inventiveness. And I've been talking, I hope, about significantly more. We know the method claims are an abstract idea. The PTO told us that. The PTO rejected all the method claims as abstract ideas. That's A874. Here's what the PTO said. Without including technology in the claims they are nothing more than an abstract idea. Okay, so we have a finding on that. Then they added electronic adjustment. That's the only thing they added to make them quote and honor the check. We have the U.S. government telling us that simply reciting a general purpose computer is not enough because, Judge Lin, it does not add significantly more. In this context, a computer is a neutral. As it was in gear, actually. That if the process is eligible or not, the computer doesn't subtract or it doesn't add. It's like a stock solution in chemistry. It's there on the shelf. You can pull it down and use it in your reaction, but it doesn't add or subtract from patent eligibility. Now... Mr. Perry, one of the problems that I've had from the very beginning here is that you keep saying if the claims don't recite a computer and yet at the district court you said, okay, let's assume the claims do recite not just the computer but specific computer functionality. Why didn't you say? Why didn't you argue with the district court? Especially, you know, with respect to Claim 33, why didn't you say that, you know, just importing all of those things from the spec is not a proper claim construction. Instead, you invite the court to do that. Because, Your Honor, a general-purpose computer, any computer off the shelf   onto an ineligible method makes it eligible, then the Supreme Court would not, could not have decided that it's in the wrong category and it's not eligible. That's the way it is. Benson was very clear on this, Your Honor. But you're not, let's stick with what you asked the district court to do. We agree that these things run on computers. But you're not now here asking us to do these claims as not requiring the computer. Your Honor, CLS Bank settles five trillion dollars in trades a day. Computers are a part of that for efficiency sake. However, merely claiming that a computer does a computational function that could be done by pencil and paper, which their expert says, doesn't change the analysis. What Justice Douglas said 40 years ago remains true today. A computational device that does what you can do in head and hand faster doesn't lend anything to patent eligibility. It doesn't subtract anything either. It is a neutral. And that is the computer that is recited here. And that, we know, by the way, from the prosecution history. The bolt on, and I have to come back to this, the hedging method in Bilski. The applicant represented to the Supreme Court that it would run on a computer. It required complex weather calculations. That made no difference to the Supreme Court. And I would submit to you that if we said a computer system configured to hedge energy transactions against weather futures, the Supreme Court would not have come out differently. And I will come back to Mayo. Running it on a computer had nothing to do with that. Certainly a computer would have made the correlation and the assay more accurate and efficient. Computers help with volume. But this is not a computer invention. The actual software in Bilski, and claimed nothing but the actual code. The particular way in which they were executing hedging on the computer, line by line, code by code. I think you could write a hedging.com program or perhaps a settlement.com program. There could be an actual programmed computer that does these things. That's research technology. That's research technology. I absolutely agree with you that there are such things as software patents and hardware patents and system claims. These aren't they. Not the ones you keep pointing at, maybe not. You keep pointing at the method claims, some of which don't even use the word computer. But the harder challenge for me is the system claims and in particular some of these ones I'm telling you about. The hard thing is both of you are addressing this as an all or nothing proposition and I'm just old-fashioned. I think you go claim by claim. Your honor, if I may answer. It is a fair point. The method claims are far more obviously ineligible than the system claims. My colleague rightly concedes that the media claims are the same as the method claims. The system claims are harder. We acknowledge that. However, bolting on any computer without disclosed software programming or a logic flow that would allow a person skilled in the art to program the computer, there is no computer that they have invented. They don't have a  They are trolling for royalties. Okay? Thank you, your honor. All right.